# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| DANIEL RAY WYERS | ) | |

## PLEA AGREEMENT

The Government and the defendant, **DANIEL RAY WYERS**, hereby acknowledge the following plea agreement in this case:

## PLEA

The defendant agrees to (i) plead guilty to **COUNT ONE** of the Information filed in the above-numbered and -captioned matter; (ii) stipulate to United States Sentencing Guideline §3A1.3 (Restraint of Victim)-2 Level Enhancement and §3A1.1 (Vulnerable Victim)-2 Level Enhancement, and (iii) waive certain rights to direct appeal and collateral attack as outlined in section **IV** of this agreement. In exchange, the United States Attorney, acting on behalf of the Government and through the undersigned Assistant United States Attorney, agree to recommend the disposition specified below, subject to the conditions in section **VII**.

**TERMS OF THE AGREEMENT**

## I.    MAXIMUM PUNISHMENT

The defendant understands that the maximum statutory punishment that may be imposed for the crime of Deprivation of Rights under Color of Law, in violation of Title 18, United States Code, Section 242, as charged in **COUNT ONE** is:

A.    Imprisonment for not more than one year;

B.    A fine of not more than 100,000.00, or;

C.    Both (a and b);

D.    Supervised release of not more than one year; and

E.    Special Assessment Fee of $25 per count.

## II.    FACTUAL BASIS FOR PLEA

The Government is prepared to prove, at a minimum, the following facts at the trial of this case:

On January 12, 2023, the Walker County Jail (Jail) was headed by the elected Sheriff, the Jail Administrator, the Captain, and officers who served as shift supervisors over two day shifts and two night shifts. Each shift was staffed by several officers who performed various duties related to the care, custody, and control of the pre-trial and post-conviction detainees housed there.

While the Jail contained several dorms to house detainees, a limited number

Defendant's Initials _DW_

of inmates were held for limited periods in observation cells in the "Booking" area.

Booking consisted of the Booking desk which formed the central hub of detainee intake, jail movement, communication, and operations. Eight booking cells could be directly observed by officers at the Booking desk several feet away. Among the eight Booking cells, BK5 was unique in that it was essentially a cement box with a small grate on the floor that opens into a hole for fluids to drain from the cell. Capable of being "flushed" only from outside of the cell, BK5 was often referred to as the drunk tank in that it could easily be hosed down when inebriated people held there would vomit. BK5 was unlike all other cells in the Jail, but for observation cell AH3, which had no hole in the floor and was used only for holding detainees for hours at a time.

BK5 did not have a sink, a toilet, access to any running water, or a raised platform to be used as a bed. Detainees housed in BK5 depended on officers to escort them to a toilet or shower and relied on officers to bring them water. BK5 was notoriously cold during winter months and the temperature on the bare cement floor was even colder. A small window was located on the top half of the cell door and a larger window covered the bottom half of the door. Again, this bottom window was unique among the observation cells, other than AH3, and offered considerably more opportunity for observation from the Booking desk than any of the other Booking cells.

Medical and mental health services were provided by an outside contractor [Medical Contractor] hired by Walker County. During the period between January

Defendant's Initials DW

12, 2023 – January 26, 2023, Medical Contractor provided the services of a Registered Nurse who acted as the Health Service Administrator (HSA), a Nurse Practitioner (NP), a Mental Health Nurse Practitioner (MHNP), and several Licensed Practical Nurses (LPNs) who, along with the HSA were principally responsible for providing day-to-day medical care to those housed at the Jail. Medical Contractor employed a Registered Nurse who acted as the Regional Director (RD) and who oversaw the provision of medical services to approximately ten jails in the region. The role of the RD was to provide support to medical staff of any individual jail, act as a necessary liaison with executive management of Medical Contractor, and manage any conflicts, disputes, or concerns between medical staff and the staff of any jail. Part of RD's responsibility was to raise concerns over detainee care with elected Sheriffs and/or their Jail Administrators once RD was notified by an HSA or another nursing professional.

As part of the booking process, all detainees booked into the jail were supposed to receive a medical and mental health screening (Screening Exams) to ensure that urgent health needs were met and to determine, among other things, their fitness for confinement. These Screening Exams would be conducted either by jailers or nurses, if nurses were available at the time of booking. Nurses also conducted initial intake evaluations (which could have been conducted at the same time as the Screening Exams) designed to obtain a more informed history for each detainee and aid in ongoing consultations/evaluations, including providing approved

medicine and other services while detainees were incarcerated. For those detainees housed in Booking, nurses would rely on officers for assistance to provide necessary medical and mental health services, including escorts into the Jail's medical unit which was located down a short hallway from Booking.

All medical staff hired by the Medical Contractor and assigned to the Jail were taught and understood that they were obligated to follow its Health Services Policy and Procedure (HSPP), which were based on the National Commission on Correctional Health Care's Standards for Health Services in Jails and Standards for Mental Health Services in Correctional Facilities.

On January 12, 2023, Walker County Sheriff's deputies responded to the home of Individual #1 in response to a request that they conduct a mental health welfare check. Individual #1 was arrested after he allegedly fired a gun while deputies were on his property. Individual #1 was transported directly to the Jail in a patrol car that was met in the Jail's sallyport by correctional officers and the HSA.

Upon arrival, Individual #1 had difficulty walking or standing on his own. He was disoriented, non-combative, and could not follow instructions. His face was painted blue from an unknown substance and officers dressed him in a "turtle suit," often used for suicidal inmates, over his otherwise nude body. As far as defendant **WYERS** knows and believes, Individual #1 was never on suicide watch and was not suicidal while he was in the Jail. The medical staff keeps a suicide watch list so that they can provide necessary observation and services to those identified as "suicidal."

Defendant's Initials _DW_

Individual #1 was not on the list, no medical provider at the jail treated him as if he was suicidal, and he was treated more severely and unlike others who had been on the list prior to, and during, Individual #1's incarceration.

Shortly after Individual #1 was arrested and booked into the Jail, defendant **WYERS** became aware of his mental health needs. Defendant **WYERS** saw the Walker County Sheriff's Office Facebook post regarding Individual #1's arrest that included a photo of Individual #1's face covered in blue paint. In addition, the Jail's NP contacted defendant **WYERS** to specifically request that he conduct a psychiatric consult with Individual #1 reflecting NP's concern about Individual #1's mental health needs and putting defendant **WYERS** on notice of those needs. By the evening of January 13, 2023, defendant **WYERS** became aware from someone who worked inside the Jail that Individual #1 was complaining of being cold and looked sick and unable to care for himself.

During the two weeks of Individual #1's incarceration, defendant **WYERS** worked approximately 2 4-hours shifts on January 17, 2023, and January 24, 2023. Yet, on neither occasion did defendant **WYERS** conduct an initial mental health screening of Individual #1. In each instance he documented his failure to do so which was available to the HSA, the NP, and LPNs.

On January 17, 2023, defendant **WYERS** saw that Individual #1 was naked in BK5 without bedding and that he was not oriented to time, place, and situation even if he could make certain logical requests such as requesting a shower because

he was covered in feces. Jailer #1 denied defendant **WYERS** access to Individual #1, claiming that Individual #1 was "too combative." However, defendant **WYERS** never witnessed him being combative or aggressive in any way and believed that Jailer #1's justification was false and designed to punish Individual #1.

Individual #1 appeared to be trying to communicate his need for a shower appropriately through his cell door, despite his intermittent lucidity. Moreover, defendant **WYERS** was charged with the responsibility in the Jail for administering psychotropic medication to aid mentally ill detainees in complying with Jail orders that might enable Individual #1 to be awarded a shower, even if he had been aggressive. He was also familiar with other exams of detainees who were far more alert and aggressive and in need of restraints than Individual #1 who were provided with their initial evaluations.

Instead, defendant **WYERS**, knowing of NP's request, and recognizing that Individual #1 was only intermittently lucid, left him naked and covered in feces without recourse. In addition, defendant **WYERS** specifically noted that Individual #1 was neither suicidal nor homicidal. However, he took no steps to address Individual #1 remaining naked in the cold cell without bedding, thereby leaving him in cruel conditions without cause.

Defendant **WYERS** understood from prior experiences in the Jail that Jailers would punish detainees for conduct committed outside of the Jail, including where they had allegedly been violent toward law enforcement. Defendant **WYERS**

Defendant's Initials _DW_

agreed with the idea that Individual #1 ought to be punished on the incorrect assumption that Individual #1 had purposefully shot at law enforcement prior to his arrest.  As such, he took no steps to provide care to Individual #1 or alert Jail or Medical Contractor authorities to unnecessarily harsh conditions of his confinement or question Jailer #1's assertions that Individual #1 was "too combative" to receive care, which he believed to be false at the time.

Upon defendant **WYERS'** return to the Jail a week later on January 24, 2023, he was asked by the HSA to evaluate Individual #1, reflecting the HSA's knowledge that Individual #1 still needed services, and again putting defendant **WYERS** on notice of those needs. Defendant **WYERS** noted that nothing had changed regarding Individual #1's conditions of confinement. There was no indication from nursing records that Individual #1 had received an initial medical or mental health screening. Individual #1 remained naked in the cold cell without bedding; he appeared listless on the cell floor, and while Individual #1 was alert, he was essentially non-verbal, only able to communicate in grunts and other noises. His physical condition appeared to have deteriorated substantially since the last time defendant **WYERS** had been in the Jail.

Once again, defendant **WYERS** visited BK5 but made no arrangements to evaluate Individual #1. Unlike Jailer #1 on January 17, 2023, Jailer #2 on January 24, 2023, offered to escort Individual #1 to the medical unit for an examination by defendant **WYERS**. Again, defendant **WYERS** refused to provide care to Individual

Defendant's Initials _DW_

#1 despite his objectively obvious need because he had no interest in providing care to someone he thought was unworthy of it and because he feared job ramifications if he offered care against the perceived "prevailing culture." Specifically, defendant **WYERS** was reluctant to take any steps that could be construed as providing assistance to Individual #1 for fear that Jail command staff would ask Medical Contractor to move defendant **WYERS** to a different jail, further from his home, which might create an inconvenient commute for him.

Moreover, defendant **WYERS** attempted to hide his choice to avoid providing necessary care to Individual #1 by falsely claiming in a nursing note that "CO's [sic] unwilling to remove him from his cell due to continued combative behavior" in the face of Jailer #2's offer to provide safe access to Individual #1 and with the presence of several other jailers nearby. In addition, in an official interview conducted after Individual #1 died, defendant **WYERS** repeated the false claim he made in his nursing note, but also falsely claimed Jailer #2 as the "CO" who was unwilling to remove Individual #1 from his cell, when in fact, Jailer #2 offered to escort Individual #1 to medical for his examination and defendant **WYERS** knew that he could safely examine Individual #1. Defendant **WYERS** chose to use that particular false claim that Individual #1 was "too combative" because he believed that Jailer #1 used that false claim the week before and because he read several nursing notes created during Individual #1's incarceration that repeated the same claim that he believed to be false.

Defendant's Initials _DW_

Defendant **WYERS** had been trained and understood that medical decisions regarding inmate care were the sole province of the responsible health care provider and should not be countermanded by non-medical personnel. He understood that the RD served the specific purpose to manage any interference by jail officials with clinical decisions. He understood that contacting the RD was of paramount importance considering the failures of the HSA and NP to correct Individual #1's conditions of confinement and to ensure that basic medical services were provided to Individual #1.

At the time of his second visit, Defendant **WYERS** believed that the totality of circumstances surrounding the detention of Individual #1 posed serious threats to his health and well-being and were contributing to his deterioration. He also recognized that Individual #1 was being treated differently than other detainees who had been placed in Booking or detainees who had actually been placed on suicide watch. As such, defendant **WYERS** concluded that holding Individual #1 in cruel conditions without access to medical and mental health care was purposeful and he purposely joined in the effort.

Defendant **WYERS** took no steps to alert the Jail's command staff nor those in Medical Contractor's chain of command to the conditions in which Individual #1 was housed or his need for medical and mental health care. As such, he did not take reasonable steps to address the objectively harmful conditions that he witnessed or fostered. In defendant **WYERS**' words, "I fell beneath the standard of care that was

expected of me."

On January 26, 2023, Individual #1 was transported to the hospital where he suffered cardiac arrest from which he did not recover. Emergency medical personnel noted that his core body temperature was 72 degrees Fahrenheit, a temperature incompatible with life. An autopsy performed by the Alabama Department of Forensic Sciences determined that the cause of Individual #1's death was hypothermia with the contributing factor of sepsis from infected injuries obtained during incarceration and medical neglect. Blood cultures revealed the presence of bacteria associated with human fecal matter.

**The defendant hereby stipulates that the facts stated above are substantially correct and that the Court can use these facts in calculating the defendant's sentence. The defendant further acknowledges that these facts do not constitute all the evidence of each and every act that the defendant and/or**

Defendant's Initials __DW__

**any co-conspirators may have committed.**

_DANIEL RAY WYERS_

## III.     RECOMMENDED SENTENCE

Subject to the limitations in section **VII** regarding subsequent conduct and

pursuant to Fed. R. Crim. P. 11(c)(1)(B), the Government will recommend the

following disposition:

> **A.**     That the defendant be awarded a two (2) level reduction in the
> defendant's adjusted offense level, based upon the defendant's apparent
> prompt recognition and affirmative acceptance of personal
> responsibility for the defendant's criminal conduct. The Government
> agrees to make a motion pursuant to USSG §3E1.1(b) for an additional
> one-level decrease in recognition of the defendant's prompt notification
> to the Government of the intention to enter a plea of guilty. The
> Government may oppose any adjustment for acceptance of
> responsibility if the defendant: (1) fails to admit each and every item in
> the factual stipulation; (2) denies involvement in the offense; (3) gives
> conflicting statements about the defendant's involvement in the
> offense; (4) is untruthful with the Court, the Government, or the United
> States Probation Officer; (5) obstructs or attempts to obstruct justice
> prior to sentencing; (6) engages in any criminal conduct between the
> date of this agreement and the date of sentencing; or (7) attempts to

Defendant's Initials _DW_

withdraw the defendant's plea of guilty for any reason other than those expressly enumerated in the "Waiver of Right to Appeal and Post-Conviction Relief" section of this Plea Agreement;

**B.**    That the defendant be remanded to the custody of the Bureau of Prisons and incarcerated for a term consistent within the advisory United States Sentencing Guideline range as calculated by the Court at the time of sentencing;

**C.**    That following said term of imprisonment, the defendant be placed on supervised release for a period to be determined by the Court, subject to the Court's standard conditions of supervised release;

**D.**    That the defendant be required to pay a fine in accordance with the sentencing guidelines should the Court determine that the defendant has the ability to pay a fine, said amount due and owing as of the date sentence is pronounced, with any outstanding balance to be paid in full by the expiration of the term of supervised release; and,

**E.**    That the defendant pay a special assessment of $25.00, said amount due and owing as of the date sentence is pronounced.

## IV.    WAIVERS

### A.    STATUTE OF LIMITATIONS WAIVER

In consideration of the recommended disposition of this case, I, **DANIEL RAY WYERS**, hereby understand, acknowledge, and agree that if this plea agreement is set aside for any reason, I will not assert any defense based on any applicable statute of limitations or the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, that includes the passage of time from and including the date of this plea agreement until and including the date of entry of any order setting this plea agreement aside.

Defendant's Initials _DW_

**B.    RIGHT TO APPEAL AND POST-CONVICTION RELIEF**

In consideration of the recommended disposition of this case, I, DANIEL RAY WYERS, hereby waive and give up my right to appeal my conviction and/or sentence in this case, as well as any fines, restitution, and forfeiture orders, the Court might impose. Further, I waive and give up the right to challenge my conviction and/or sentence, any fines, restitution, forfeiture orders imposed or the manner in which my conviction and/or sentence, any fines, restitution, and forfeiture orders were determined in any post-conviction proceeding, including, but not limited to, a motion brought under 28 U.S.C. § 2255, and any argument that (1) the statute to which I am pleading guilty is or are unconstitutional or (2) the admitted conduct does not fall within the scope of the statute.

The defendant reserves the right to contest in an appeal or post-conviction proceeding(s) the following:

      1.    Any sentence imposed in excess of the applicable statutory maximum sentence(s);

      2.    Any sentence imposed in excess of the Guidelines range determined by the Court at the time sentence is imposed; and

      3.    Ineffective assistance of counsel.

The defendant acknowledges that before giving up these rights, the defendant discussed the United States Sentencing Guidelines and their

Defendant's Initials _DW_

application to the defendant's case with the defendant's attorney, who explained them to the defendant's satisfaction. The defendant further acknowledges and understands that the Government retains its right to appeal where authorized by statute.

C.    WAIVER OF RULE 410, RULE 11, AND SECTION 1B1.8(a)

The defendant agrees that if he fails to comply with any of the provisions of this agreement, including the failure to tender such agreement to the district court, or attempts to withdraw the plea (prior to or after pleading guilty to the charges identified in the agreement), the government will have the right to characterize such conduct as a breach of the agreement. In the event of such a breach, the defendant waives any protections afforded by Section 1B1.8(a) of the Sentencing Guidelines, Rule 11 of the Federal Rules of Criminal Procedure, and Rule 410 of the Federal Rules of Evidence, and the government will be free to use against the defendant, directly and indirectly, in any criminal or civil proceeding any of the information, statements, and materials provided by him pursuant to this agreement, including offering into evidence or otherwise using the attached Agreed Factual Basis for Guilty Plea.

Defendant's Initials _DW_

**I, DANIEL RAY WYERS,** hereby place my signature on the line directly below to signify that I fully understand the foregoing paragraphs, and that I am knowingly and voluntarily entering into this waiver.

**DANIEL RAY WYERS**

## V.     UNITED STATES SENTENCING GUIDELINES

The defendant's counsel has explained to the defendant, that in light of the United States Supreme Court's decision in *United States v. Booker*, the federal sentencing guidelines are **advisory** in nature. Sentencing is in the Court's discretion and is not required to be within the guideline range. The defendant agrees that, pursuant to this agreement, the Court may use facts it finds by a preponderance of the evidence to reach an advisory guideline range, and the defendant explicitly waives any right to have those facts found by a jury beyond a reasonable doubt.

## VI.     AGREEMENT NOT BINDING ON COURT

The defendant fully and completely understands and agrees that it is the Court's duty to impose sentence upon the defendant and that any sentence recommended by the Government is **NOT BINDING UPON THE COURT,** and that the Court is not required to accept the Government's recommendation. Further, the defendant understands that if the Court does not accept the Government's recommendation, the defendant does not have the right to withdraw the guilty plea.

## VII.    VOIDING OF AGREEMENT

The defendant understands that if the defendant (a) violates any federal, state, or local law or any condition of pretrial release after entering into this plea agreement, (b) moves the Court to accept a plea of guilty in accordance with, or pursuant to, the provisions of *North Carolina v. Alford*, 400 U.S. 25 (1970), (c) tenders a plea of *nolo contendere* to the charges, (d) violates any other term of this plea agreement, and/or (e) does or says anything that is inconsistent with the acceptance of responsibility, the plea agreement will become NULL and VOID at the election of the United States, and the United States will not be bound by any of the terms, conditions, or recommendations, express or implied, which are contained herein.  Further, such election will not entitle the defendant to withdraw a previously entered plea.

The defendant further understands and agrees that if at any time, the government determines that the defendant has 1) falsified, concealed, covered up, or omitted a material fact; 2) made any false, fictitious, or fraudulent statement or representation; or 3) otherwise provided material information or evidence that is not full, complete, and accurate, the obligations of the government under the plea agreement will become NULL and VOID at the election of the United States, and the United States will not be bound by any of the terms, conditions, or recommendations, express or implied, which are contained herein. In that event, the

Defendant's Initials _____

government may also prosecute the defendant for false statements, perjury, or obstruction of justice and use any admissions made by the defendant at any time, including during plea negotiations, for any purpose. Further, such election will not entitle the defendant to withdraw his previously entered plea.

## VIII.    OTHER DISTRICTS AND JURISDICTIONS

The defendant understands and agrees that this agreement **DOES NOT BIND** any other United States Attorney in any other district, or any other state or local authority.

## IX.    COLLECTION OF FINANCIAL OBLIGATION

To facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees to:

- fully disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party;

- promptly submit a completed financial statement to the United States Attorney's Office, in a form that it provides and as it directs;

- identify all assets over which the defendant exercises or exercised control, directly or indirectly, within the past five years, or in which the defendant has or had during that time any financial interest;

- take all steps as requested by the Government to obtain from any other parties by any lawful means any records of assets owned at any time by the defendant;

- undergo any polygraph examination the Government may choose to administer concerning such assets and to provide and/or consent to the release of the defendant's tax returns for the previous five years.

The defendant further agrees that the above information, as well as any of the defendant's financial statements and disclosures, will be complete, accurate, and truthful. Finally, the defendant expressly authorizes the United States Attorney's Office to obtain a credit report on the defendant to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

## X.    AGREEMENT REGARDING RELEVANT CONDUCT AND RESTITUTION

As part of the defendant's plea agreement, the defendant admits to the above facts associated with the charges and relevant conduct for any other acts. The defendant understands and agrees that the relevant conduct contained in the factual basis will be used by the Court to determine the defendant's range of punishment under the advisory sentencing guidelines. The defendant admits that all the crimes listed in the factual basis are part of the same acts, scheme, and course of conduct. This agreement is not meant, however, to prohibit the United States Probation Office or the Court from considering any other acts and factors, which may constitute or

relate to relevant conduct. Additionally, if this agreement contains any provisions providing for the dismissal of any counts, the defendant agrees to pay any appropriate restitution to each of the separate and proximate victims related to those counts should there be any and waives objection to the inclusion of that restitution in any order issued by the Court.

## XI.  TAX, FORFEITURE AND OTHER CIVIL/ADMINISTRATIVE PROCEEDINGS

Unless otherwise specified herein, the defendant understands and acknowledges that this agreement does not apply to or in any way limit any pending or prospective proceedings related to the defendant's **tax liabilities**, if any, or to any pending or prospective **forfeiture** or other **civil** or **administrative** proceedings.

## XII.  IMMIGRATION STATUS

The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. The defendant's guilty plea and conviction make it practically inevitable and a virtual certainty that the defendant will be removed or deported from the United States if the defendant is not a citizen of the United States. Removal and other immigration consequences are the subject of a separate proceeding, however; and the defendant understands that

Defendant's Initials ___

no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Understanding all of this, the defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences that the plea may entail, even if the consequence is automatic removal from the United States.

## XIII.        DEFENDANT'S ACKNOWLEDGEMENT

I have read and understand the provisions of this plea agreement consisting of twenty three (23) pages. I have discussed the case and my constitutional and other rights with my lawyer. I am satisfied with my lawyer's representation in this case. I understand that by pleading guilty, I will be waiving and giving up my right to continue to plead not guilty, to a trial by jury, to the assistance of counsel at that trial, to confront, cross-examine, or compel the attendance of witnesses, to present evidence on my behalf, to maintain my privilege against self-incrimination, and to the presumption of innocence. I agree to enter my plea as indicated above on the terms and conditions set forth herein.

**NO PROMISES OR REPRESENTATIONS OTHER THAN THOSE IN THE AGREEMENT HAVE BEEN MADE TO ME BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED TO INDUCE ME TO PLEAD GUILTY.**

Defendant's Initials _DW_

I further state that I have not had any drugs, medication, or alcohol within the past 48 hours except as stated here:

_____

I understand that this plea agreement will take effect and will be binding as to the Parties **only** after all necessary signatures have been affixed hereto.

I have personally and voluntarily placed my initials on every page of this plea agreement and have signed the signature line below to indicate that I have read, understand, and approve all the provisions of this plea agreement, both individually and as a total binding agreement.

10-21-24
DATE

**DANIEL RAY WYERS**
Defendant

## XIV.    COUNSEL'S ACKNOWLEDGMENT

I have discussed this case with my client in detail and have advised my client of all my client's rights and all possible defenses. My client has conveyed to me that my client understands this plea agreement and consents to all its terms. I believe the plea and disposition set forth herein are appropriate under the facts of this case and are in accord with my best judgment. I concur in the entry of the plea agreement on the terms and conditions set forth herein.

10/21/24
DATE

**CHRISTOPHER DANIELS**
Defendant's Counsel

## XV.     GOVERNMENT'S ACKNOWLEDGMENT

I have reviewed this matter and this plea agreement and concur that the plea

and disposition set forth herein are appropriate and are in the interests of justice.

**PRIM F. ESCALONA**
United States Attorney

10/22/24
DATE

*Michael A. Royster*

**MICHAEL A. ROYSTER**
Assistant United States Attorney

**KRISTEN CLARKE**
Assistant Attorney General
Civil Rights Division

10/22/24
DATE

*Mark Blumberg by MAR*

**MARK BLUMBERG**
Special Legal Counsel
Civil Rights Division

10/22/24
DATE

*Andrew Cherry by MAR*

**ANDREW CHERRY**
Trial Attorney
Civil Rights Division

Defendant's Initials ___